IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: § | |
| § | Case No. 20-35675 |
| **ASAIG, LLC**, *et al.*, § | |
| § | Chapter 11 |
| Debtors.[1] § | |
| § | (Joint Administration Requested) |
| § | (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF
INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364
AND 507, AND BANKRUPTCY RULES 2002, 4001 AND 9014 (I) AUTHORIZING USE
OF CASH COLLATERAL; (II) AUTHORIZING THE DEBTORS TO OBTAIN
SECURED POST-PETITION FINANCING; (III) GRANTING LIENS AND
SUPERPRIORITY CLAIMS; (IV) GRANTING ADEQUATE PROTECTION; (V)
<u>SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF</u>**

**EMERGENCY RELIEF HAS BEEN REQUESTED.**

**IF YOU OBJECT TO THE REQUESTED RELIEF OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST FILE A WRITTEN RESPONSE PRIOR TO THE BELOW DATE BY WHICH RELIEF IS REQUESTED. OTHERWISE, THE COURT MAY TREAT THE REQUEST AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AUDIO/VIDEO CONNECTION.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT (832) 917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE ISGUR'S CONFERENCE ROOM NUMBER IS 954554.**

**YOU MAY VIEW VIDEO VIA GOTOMEETING. TO USE GOTOMEETING, THE COURT RECOMMENDS THAT YOU DOWNLOAD THE FREE GOTOMEETING APPLICATION. TO CONNECT, YOU SHOULD ENTER THE MEETING CODE "JUDGEISGUR" IN THE GOTOMEETING APP OR CLICK THE LINK ON JUDGE ISGUR'S HOME PAGE ON THE SOUTHERN DISTRICT OF TEXAS WEBSITE. ONCE CONNECTED, CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

---

[1] The debtors and debtors in possession these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: Aztec / Shaffer, LLC (2038); and ASAIG, LLC (2323). The Debtors' service address is: 601 W. 6th Street, Houston, Texas 77007.

> **HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF THE HEARING. TO MAKE YOUR ELECTRONIC APPEARANCE, GO TO THE SOUTHERN DISTRICT OF TEXAS WEBSITE AND SELECT "BANKRUPTCY COURT" FROM THE TOP MENU. SELECT "JUDGES' PROCEDURES" THEN "VIEW HOME PAGE" FOR JUDGE ISGUR. UNDER "ELECTRONIC APPEARANCE" SELECT "CLICK HERE TO SUBMIT ELECTRONIC APPEARANCE". SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS, AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**
>
> **IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**
>
> **RELIEF IS REQUESTED NOT LATER THAN NOVEMBER 25, 2020.**

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") respectfully state the following in support of this emergency motion (the "**Motion**"):

## I. RELIEF REQUESTED

1. By this Motion, the Debtors request the entry of an interim order, substantially in form attached hereto (the "**Interim Order**"), providing for, among other things:

   a. authorizing the Debtors' use of existing Cash Collateral solely to fund payroll to Employees (the "**Employee Obligations**") due on November 27, 2020;

   b. authorization for the Debtors to obtain senior secured, post-petition financing on a priming, super-priority basis from Texas Capital Bank, N.A (the "**DIP Lender**") pursuant to the terms of the Interim Order to fund payroll to Employees due on November 27, 2020, in an aggregate principal amount of the difference between existing Cash Collateral and the Employee Obligations pursuant to terms of the existing First Lien Credit Agreement (the "**DIP Financing**"). For the avoidance of doubt this DIP Financing shall be characterized as a post-petition discretionary advance as a revolving loan under the First Lien Credit Agreement;

   c. granting valid, enforceable, non-avoidable, and automatically fully perfected priming liens on, and security interests in, the applicable collateral (the "**DIP Collateral**") to the DIP Lender to secure all obligations (the "**DIP Obligations**") pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code;

   d. granting allowed superpriority administrative claims to the DIP Lender with respect to the DIP Obligations pursuant to section 364(c)(1) of the Bankruptcy Code;

2

   e. modifying the automatic stay of section 362 of the Bankruptcy Code to the extent set forth herein and in the DIP Documents, and providing for the immediate effectiveness of this Interim Order; and

   f. scheduling a final hearing (the "**Final Hearing**") to consider entry of an granting the relief requested in the Motion on a final basis (the "**Final Order**"), and authorizing the Borrower to borrow from the DIP Lender up to the full amount of the DIP Financing.

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and this Court may enter a final order consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The bases for the relief requested herein are Sections 105, 361, 362, 363, 364 and 507 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended and modified, the "**Bankruptcy Code**"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 2002, 4001-1(b) and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**"), and the Procedures for Complex Chapter 11 Cases in the Southern District of Texas (the "**Complex Case Procedures**").

## III. BACKGROUND

### A. The Previous Bankruptcy Case

5. These cases (the "**Chapter 11 Cases**") commenced on November 17, 2020 (the "**Petition Date**"), when ASAIG, LLC ("**ASAIG**") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Court**"). At the same time, ASAIG directed its subsidiary Aztec /

3

Schaffer, LLC ("**Aztec**," and, collectively, with ASAIG, the "**Debtors**") to also seek chapter 11 relief.

6. Prior to the commencement of the Chapter 11 Cases, Cortland Capital Market Services LLC ("**Cortland**") as collateral agent for certain of the Debtor's pre-petition secured lenders, including American General Life Insurance Company ("**American Life**"), The Variable Annuity Life Insurance Company ("**Variable**"), and American Home Assurance Company ("**American Home**", and collectively with American Life and Variable, the "**AIG Lenders**," and collectively with Cortland, the "**First Lien Lenders**"), exercised certain remedies under the applicable pre-petition loan documents to effectuate a change in the management of Aztec.

7. The First Lien Lenders challenged the filing of Aztec's initial bankruptcy petition, and, on November 23, 2020, this Court struck Aztec's petition. In so ruling, however, the Court also ruled that the automatic stay, effective in ASAIG's Chapter 11 Case, prevented the First Lien Lenders from continuing to assert management control over Aztec.

8. On November 24, 2020, after failing to make substantive progress regarding negotiations with the First Lien Lenders, ASAIG filed its *Emergency Motion for Order Pursuant to §§ 105 and 363 of the Bankruptcy Code Authorizing the Debtor-in-Possession to Take Actions Necessary to Preserve Property of the Estate* [ECF # 7] (the "**Preservation Motion**"). The Court granted the Preservation Motion by oral ruling on November 24, 2020 (the "**Preservation Order**").

9. Following entry of the Preservation Order, ASAIG's principals met with principals of the First Lien Lenders and Texas Capital Bank, N.A. ("**TCB**"). Throughout the day, ASAIG continued to negotiate with the First Lien Lenders in an effort to reach agreement regarding

funding this business – most pressingly, funding needed to meet certain payroll obligations, the Employee Obligations, already incurred by the Debtor – but were unable to reach an agreement.

10. In the absence of an agreement involving the First Lien Lenders, TCB agreed to advance funds sufficient to pay incurred and owing Employee Obligations, provided that Aztec commence a new chapter 11 case. With no other viable options, ASAIG directed the manager of Aztec to accept TCB's proposal – at which time the manager resigned. ASAIG, pursuant to the Preservation Order, has appointed a replacement manager and authorized the second Aztec chapter 11 petition.

**B.     General Background**

11. Pursuant to Bankruptcy Code sections 1107(a) and 1108, the Debtors are operating their businesses and managing their property as debtors in possession. No request has been made for the appointment of a trustee or examiner, and no official committee has been appointed in the Chapter 11 Cases.

12. Formed on or about April 14, 2015, Debtor Aztec / Shaffer, LLC ("**Aztec**"), a Texas limited liability company, is one of the premier party rental and tenting specialists in Houston and provides services for events both domestically and internationally. The Debtors' two business segments, Aztec Events and Shaffer Sports, have both been in business for over sixty (60) years. The Debtor was formed to purchase the businesses from the former owner, Double Eagle Sports & Events.

13. The Aztec Events segment of the business maintains the largest party and event rental inventory in the Houston metropolitan area. Its services individuals and corporate clientele hosting events ranging from small weddings to large corporate retreats. Such events include the Houston Livestock Show & Rodeo, the MS150 Bike Ride and the Offshore Technology

Conference. The Shaffer Sports division is a leading event rental company for sporting events throughout North America and the Caribbean. The Debtor has established itself as the go-to service provider for more than 150 major events, including more than 40 of the PGA Tour's most prestigious golf tournaments, where it provides unique tenting, indoor and outdoor structures, seating, and other products designed meet the client's individual needs.

14. Formed on or about January 23, 2019, Debtor ASAIG, LLC ("**ASAIG**"), a Texas limited liability company, was formed to act as the holding company for Debtor Aztec, its wholly-owned subsidiary. The Debtors maintain their corporate headquarters at 601 W. 6th Street, Houston, Texas 77007, but also maintain offices and a 125,000 square foot warehouse facility at 10901 Tanner Road, Houston, Texas 77041.

C. **Secured Debt Facilities**

15. The Debtors have incurred a substantial amount of debt in order to fund their activities and sustain operations. A detailed description of the Debtors' various credit and security agreements is set forth below.

   i. *First Lien Debt*

16. Prior to the Petition Date, the Debtors were parties to that certain First Lien Credit Agreement dated as of February 13, 2019 (as amended, restated, supplemented, or otherwise modified from time to time, the "**First Lien Credit Agreement**"), by and among Aztec, as borrower, ASAIG, as guarantor, Cortland, TCB as revolving agent, and the financial institutions party thereto from time to time, as lenders (the "**First Lien Lenders**"), including the AIG Lenders.

17. As security against the Debtors' obligations (the "**First Lien Debt**") under the First Lien Credit Agreement, the Debtors granted Cortland, for the benefit of the First Lien Lenders, liens in substantially all of their assets pursuant to that certain First Lien Security Agreement dated

6

as of February 13, 2029 (the "**First Lien Security Agreement**"), by and among Aztec and ASAIG, as grantors, and the Collateral Agent. Among other collateral securing the First Lien Debt, ASAIG pledged its 100% equity interest in Aztec (the "**Pledged Equity**") in favor of the Collateral Agent for the benefit of the First Lien Lenders. Significantly, however, the members of ASAIG are not guarantors under the First Lien Credit Agreement and have not pledged their interests in ASAIG.

    ii.    *Second Lien Debt*

18. In addition to the First Lien Debt, the Debtors have also incurred a substantial amount of second lien debt. Prior to the Petition Date, the Debtors were parties to that certain Second Lien Credit Agreement dated as of February 13, 2019 (as amended, restated, supplemented, or otherwise modified from time to time, the "**Second Lien Credit Agreement**"), by and among Aztec, as borrower, ASAIG, as guarantor, Cortland, as administrative agent and collateral agent, and the financial institutions party thereto from time to time, as lenders (the "**Second Lien Lenders**"), including the AIG Lenders.

19. As security against the Debtors' obligations (the "**Second Lien Debt**") under the Second Lien Credit Agreement, the Debtors granted Cortland, for the benefit of the Second Lien Lenders, liens in substantially all of their assets pursuant to that certain Second Lien Security Agreement dated as of February 13, 2029 (the "**Second Lien Security Agreement**"), by and among Aztec and ASAIG, as grantors, and the Collateral Agent.

**D.**    **Unsecured Debt**

In addition to the prepetition First Lien Debt and Second Lien Debt, the Debtors have substantial unsecured debt owed to numerous trade creditors, among others. In the ordinary course of business, the Debtors have engaged in numerous strategic relationships with various service providers in relation to their operations which are critical to maintaining the value of the Debtors'

estates. Due to the various liquidity issues described herein, the Debtors do not have sufficient cash flow to pay the trade payables. The Debtors' largest unsecured creditor is PGA Tour, Inc. (the "**PGA**") The PGA was allegedly owed an approximate outstanding balance of $6,431,058.60 as of the Petition Date.[2]

### E. Necessity of Debtor in Possession Financing and Use of Cash Collateral

20. In order to continue operations that would substantially increase the value of the Debtors' bankruptcy estates, the Debtors will require the use of Cash Collateral and an injection of new cash as working capital to pay the Employee Obligations and ensure a smooth transition into the Chapter 11 Cases. The Debtors do not currently have sufficient cash from operations to pay the Employee Obligations as they come due and address certain operational issues necessary to preserve the value of their businesses, such as paying employees and maintaining vendor relationships. Preserving estate value and maintaining employee relationships is vital in these Chapter 11 Cases.

21. The Debtors have an immediate need to use cash right away to fund the payroll due on November 27, 2020. Presently, the Debtors' Employee Obligations total approximately $550,000, but the Debtors' only possess approximately $270,000. Accordingly, the Debtors require the use of Cash Collateral – the approximately $270,000 and approximately $280,000 in DIP Financing. As a result, the DIP Lender has agreed to extend the DIP Financing to fund the needed cash through the debtor-in-possession loan to the Debtors on emergency basis to fund the Employee Obligations. The primary terms of the proposed DIP Financing are set forth below:

---

[2] The Debtors reserve the right to dispute the amount allegedly owed.

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) of the Complex Case Procedures |
|---|---|
| **Parties to the DIP Financing Agreement** <br> Bankruptcy Rule 4001(c)(1)(B) | Borrowers:  Aztec/Shaffer, LLC and ASAIG, LLC <br> Guarantors:  None <br> DIP Lender: Texas Capital Bank, N.A. |
| **Term** <br> Bankruptcy Rules 4001(b)(1)(B)(iii), 4001(c)(1)(B) | N/A |
| **Loan Commitment** <br> Bankruptcy Rule 4001(c)(1)(B) | Total aggregate commitment of approximately $270,000 or the difference between the existing Cash Collateral amounts and the Employee Obligations. |
| **Conditions of Borrowing** <br> Bankruptcy Rule 4001(c)(1)(B) | N/A |
| **Interest Rates** <br> Bankruptcy Rule 4001(c)(1)(B) | Interest Rate:  N/A |
| **Use of DIP Facility and Cash Collateral** <br> Bankruptcy Rule 4001(b)(l)(B)(ii) | The proceeds of the DIP Financing shall be used to fund the Employee Obligations. The proceeds of the DIP Financing may only be used to fund the difference between the existing Cash Collateral amount and the Employee Obligations. |
| **Budget** <br> Bankruptcy Rule 4001(c)(1)(B) | The use of cash and proceeds from the DIP Financing may only be used to fund the difference between the existing Cash Collateral amount and the Employee Obligations. |
| **Fees** <br> Bankruptcy Rule 4001(c)(1)(B) | N/A |
| **Reporting Information** <br> Bankruptcy Rule 4001(c)(l)(B) | N/A |
| **Variance Covenant** <br> Bankruptcy Rule 4001(c)(l)(B) | N/A |
| **Chapter 11 Milestones** <br> Bankruptcy Rule 4001(c)(1)(B) | N/A |
| **Liens and Priorities** <br> Bankruptcy Rule 4001(c)(l)(B)(i) | The Debtors' obligations under the DIP Financing will: <br> (a) be secured by a perfected first-priority priming lien on the encumbered DIP Collateral (the "**DIP Liens**"), subject only to the Permitted Prior Liens, a |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) of the Complex Case Procedures |
|---|---|
| | first priority security interest in and lien on all unencumbered DIP Collateral, and a junior security interest in and lien on all DIP Collateral that is subject to a Permitted Prior Lien; and<br><br>(b) constitute allowed super-priority administrative expense claims, pursuant to section 364(c) of the Bankruptcy Code, having priority over all administrative expenses specified in or ordered pursuant to the Bankruptcy Code (the "**DIP Superpriority Claims**"). |
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B) | N/A |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B) | N/A |
| **Waiver/Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay is vacated and modified to the extent necessary to permit (a) the Debtors to grant the DIP Liens and the DIP Superpriority Claims, and to perform any and all acts as the DIP Lender may request to assure the perfection and priority of the DIP Liens; and (b) the Debtors to pay any and all amounts as provided in the Interim Order and in the DIP Documents |
| **Waiver of Rights Under Section 506(c)**<br>Bankruptcy Rule 4001(c)(1)(x) | N/A |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens**<br>Bankruptcy Rule 4001(c)(1)(B)(vii) | N/A |

## IV. BASIS FOR RELIEF REQUESTED

**A.    The Debtors Should Be Authorized to Obtain Post-Petition DIP Financing**

22.    Section 364(b) of the Bankruptcy Code provides:

> The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a)

10

of this section, allowable under section 503(b)(1) of this title as an administrative expense.

11 U.S.C. § 364(b).

23. If a debtor cannot obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, a bankruptcy court can authorize the incurring of debt:

(1) with priority over an or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code];

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c)(1) – (3). Further, pursuant to section 364(d) of the Bankruptcy Code, a court may authorize a debtor to obtain post-petition credit secured by a lien that is equal or senior in priority to existing liens on encumbered property (*i.e.*, a priming lien) when a debtor is unable to obtain credit on other terms and the interests of existing lienholders are adequately protected, or if the existing lienholders consent to such priming. 11 U.S.C. § 364(d).

24. Additionally, Bankruptcy Rule 4001(c) governs the procedures for obtaining authorization for post-petition financing and specifies, *inter alia*, the content, hearing and notice requires of the motion. *See* FED. R. BANKR. P. 4001(c)(1) - (3).

25. In seeking the approval of a post-petition loan, bankruptcy courts consider the following factors in determining whether obtaining post-petition financing pursuant to section 364(c) is appropriate: (i) whether the debtor is unable to obtain unsecured credit under section 364(b); (ii) whether the transaction is necessary to preserve the assets of the debtor's estate; and (iii) whether the terms of the transaction are fair, reasonable and adequate under the circumstances. *See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011) (noting these

three factors in considering proposed post-petition financing) (citations omitted); *In re Farmland Indus., Inc.*, 294 B.R. 855, 879 (Bankr. W.D. Mo. 2003) (noting that courts look to various factors including whether "the proposed financing is an exercise of sound and reasonable business judgment").

26. In considering these factors, courts grant considerable deference to a debtor's business judgment in obtaining post-petition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g., In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving post-petition financing on an interim basis as exercise of debtor's business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

27. The Debtors propose to obtain the DIP Financing, in part, by providing DIP Liens and DIP Superpriority Claims pursuant to section 364(c) of the Bankruptcy Code. Significantly, the Debtors intend to provide the DIP Lender with first priority liens on substantially all of the Debtors' assets constituting the DIP Collateral as consideration for the DIP Financing and use of the DIP Lender's cash collateral (the "**Cash Collateral**"). As set forth below, the Debtors submit that the Motion and the Interim Order satisfy the requirements of the Bankruptcy Code and Bankruptcy Rules and should be approved by the Court.

    i.  *<u>The Debtors Have Been Unable to Obtain an Offer for Unsecured Financing</u>*

  28.  Due to the emergency nature of the filing of these bankruptcy cases, the Debtors were unable to seek out unsecured credit in an effort to obtain the necessary financing to preserve and protect the value of their estates.  However, considering the credit markets and the speed in which these cases filed for bankruptcy protection, it would seem very unlikely that the Debtors could obtain unsecured credit from any third parties allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code.  The DIP Lender is unwilling to make any loan to allow the Debtors to move forward with reorganization without a first lien on the Debtors' assets. Given the exigent circumstances of these Chapter 11 Cases, the Debtors believe that a first lien would also be required by any other prospective lender, assuming one could be found.  Thus, the Debtors believe that the DIP Liens afforded under the DIP Financing may be incurred by the Debtors, and that priming the liens of the AIG Lenders, on the Prepetition Collateral provides the best chance for such creditors to recover on their outstanding claims.

    ii.  *<u>The DIP Financing is Necessary to Preserve Estate Assets</u>*

  29.  The Debtors require additional funds to sustain their ongoing operations during the Chapter 11 Cases.  The Debtors submit that incurring the DIP Financing constitutes a sound exercise of their business judgment because it will allow the Debtors to maintain the current level of operations needed to preserve estate value and progress towards a sale process.  Without approval of the DIP Financing, the Debtors will unable to pay their Employee Obligations needed to preserve estate value. Accordingly, the Debtors submit that the DIP Financing should be approved by the Court because it is vital to preserving estate value and is in the best interests of the Debtors, creditors and all parties in interest.

   *iii.* <u>*The Terms of the DIP Financing Are Fair and Reasonable*</u>

 30. In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances and disparate bargaining power of both the debtor and the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

 31. Here, the terms of the and DIP Financing are fair and reasonable in light of the circumstances of these Chapter 11 Cases. The terms of the Interim Order have been heavily negotiated, and although the DIP Financing provides for first liens on the Debtors' DIP Collateral, the Debtors are only priming certain prepetition liens on the Prepetition Collateral that are already held by the DIP Lender. The Debtors submit that they could never obtain a loan under equal or better terms if they had to go into the capital markets, and that the DIP Financing is necessary and appropriate under the circumstances of these Chapter 11 Cases.

 32. Moreover, the DIP Financing is designed to permit the Debtors to obtain the needed liquidity to maximize the value of their assets through the continued operations of the Debtors.

**B.** <u>**Use of Cash Collateral**</u>

 33. Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral if each entity that has an interest in such cash collateral consents or if the court, after notice and a hearing, authorizes the use of the cash collateral. 11 U.S.C. § 362(c)(2). Cash collateral is defined as, "[C]ash, negotiable instruments, documents of title, securities, deposit

accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest […]." 11 U.S.C. § 363(a).

34. Bankruptcy Code section 363(c)(3) requires a court to condition a debtor's use of cash collateral as is necessary to provide adequate protection of the interest in the cash collateral claimed by a party. 11 U.S.C. § 363(c)(3). Additionally, section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property … proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

35. The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis. *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996). "Its application is left to the vagaries of each case … but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." *Id*. (quoting *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)). Examples of adequate protection are provided for in section 361 and include, but are not limited to: (i) making a cash payment or periodic cash payments to a secured creditor to the extent that the estate's use of property will result in a decrease in the value of such creditor's interest in the property; (ii) provisions for an additional or replacement lien to the extent that the use of such property will cause a decrease in the value of such entity's interest in the property; and (iii) granting such other relief as will result in the realization by the creditor of the indubitable equivalent of such creditor's interest in the property. *See In re C.G. Chartier Constr., Inc.*, 126 B.R. 956, 960 (E.D. La. 1991).

36. The Debtors are requesting authority to use the full amount of the First Lien Lenders' and Second Lien Parties' Cash Collateral, and any other cash collateral in connection

with Prepetition Collateral of the AIG Lenders for the purposes of meeting their Employee Obligations.

37. The DIP Lender consents to the use of Cash Collateral. As of the filing of this Motion, the AIG Lenders have not indicated their consent to the (i) financing arrangements and (ii) the Debtors' proposed use of Cash Collateral on the terms and conditions of the Interim Order.

38. If the Debtors are not allowed use of the Cash Collateral, then the Debtors will be unable to operate and will likely need covert this case to a chapter 7 and lay off over 200 employees. Additionally, if the Debtors are not allowed the use of Cash Collateral, then all creditors asserting liens against the Prepetition Collateral will be significantly harmed. Specifically, the Debtors would be forced to liquidate their assets. Accordingly, the Debtors seek authority to use Cash Collateral out of an abundance of caution and respectfully submit that (i) use of Cash Collateral is necessary to avoid the shutdown of the Debtors' businesses; and (ii) is in the best interests of the Debtors, their estates and their creditors as the Debtors advance toward a sale process in these Chapter 11 Cases.

39. Indeed, the Debtors believe the priming position of the DIP Liens is necessary and appropriate under the unique circumstances of these Chapter 11 Cases, as more fully set forth above. Accordingly, the Debtors request that, pending the Final Hearing, the Court schedule the Interim Hearing as soon as practicable to consider the Debtors' request for authorization to use Cash Collateral, in accordance with and pursuant to the terms and conditions contained in the Interim Order.

## V. REQUEST FOR APPROVAL POST-PETITION RETAINERS

40. Bankruptcy Local Rule 2016-1(b) provides that "[i]n chapter 11 cases, retainers may be deposited with attorneys or accountants only (i) prior to the filing of the petition; or (ii) pursuant to a Court order, if paid after the filing of the petition." B.L.R. 2016-1(b). The Budget

approved by the Debtors and DIP Lender provides for, *inter alia*, payment of post-petition retainers for the Debtors' proposed professionals in the amount of $50,000 each. By this Motion, the Debtors request that the Court approve payment of retainers to be deposited in the client trust account by the respective professionals in accordance with the Budget, the Interim Order, and any Final Order entered by the Court. Given the exigent circumstances of these Chapter 11 Cases and the limited cash available to the Debtors prior to the Petition Date to retain professionals, the Debtors believe that payment of a post-petition retainer to the Debtors' two retained professionals is necessary and appropriate under the circumstances.

## VI.   REQUEST FOR FINAL HEARING

41.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

42.     Pursuant to Bankruptcy Rules 4001(b)(2) and the Complex Case Procedures, the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## VII.   BASIS FOR EMERGENCY RELIEF

43.     The Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Local Rule 9013-1(i) and Bankruptcy Rule 6003, which authorizes a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." FED. R. BANKR. P. 6003. Here, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their

17

operations and that any delay in granting the relief requested could cause irreparable harm. Furthermore, the Debtors' next payroll date is November 27, 2020.  Thus, the failure to receive the requested relief would severely disrupt the Debtors' operations at this critical juncture and imperil the Chapter 11 Cases.  Accordingly, the Debtors respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

## VIII. RESERVATION OF RIGHTS

44. Nothing contained herein shall be deemed: (i) an admission as to the amount of, basis for, or validity of any claim against any of the Debtors; (ii) an impairment or waiver of the Debtors' or any other party in interest's right to dispute any claim against, or interest in, any Debtor, its property or its estate; (iii) a promise or requirement to pay any prepetition claim; (iv) a waiver of any claims or causes of action which may exist against any Employee, taxing authority, benefit service provider, or benefits provider; (v) an assumption, adoption, or rejection or any agreement, contract, or lease under section 365 of the Bankruptcy Code; (vi) an implication or admission that any particular claim of a type specified or defined in this Motion, or any order granting the relief requested by this Motion; (vii) an implication, admission, or finding as to (a) the validity, enforceability, or perfection of any interest or encumbrance on the property of any Debtor or its estate or (b) the applicability of any exception or exclusion from property of the estate under section 541 of the Bankruptcy Code or other applicable law; (viii) an impairment or waiver of any claims or causes of action which may exist against any entity; or (ix) a waiver of any Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

## IX. REQUEST FOR WAIVER OF STAY

45. To the extent that the relief sought in this Motion constitutes a use of property under Bankruptcy Code section 363(b), the Debtors seek a waiver of the fourteen-day stay under

Bankruptcy Rule 6004(h).  Further, to the extent applicable, the Debtors requests that the Court find that the provisions of Bankruptcy Rule 6003 are satisfied.  As explained herein, the relief requested in this Motion is immediately necessary for the Debtors to be able to continue to operate its business and preserve the value of the estate.

## X.  NOTICE

46. Notice of this Motion has been provided by telecopy, email, overnight courier and/or hand delivery, to: (i) the Office of the United States Trustee for the Southern District of Texas; (ii) the Debtors' prepetition secured lenders, Texas Capital Bank, N.A. and AIG Asset Management (U.S.), LLC; (iii) the collateral agent and administrative agent for the prepetition secured lenders, Cortland Market Services LLC; (iv) the 30 largest unsecured creditors of each of the respective Debtors (as found on Official Form 204); (v) the Internal Revenue Service; and (vi) any party that has requested notice pursuant to Bankruptcy Rule 2002.  Under the circumstances, such notice of the hearing and the relief requested in the Motion constitutes due, sufficient and appropriate notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 9014, the Bankruptcy Local Rules and the Complex Case Procedures.  The Debtors submit that no other or further notice need be provided.

## XI.  PRAYER

WHEREFORE, the Debtors respectfully request that this Court enter the Interim Order, substantially in the form submitted herewith: (i) authorizing the Debtors to obtain the DIP Financing on an interim basis pursuant to the terms of the Interim Order; (ii) authorizing the continued use of Cash Collateral as necessary to pay the Employee Obligations; (iii) setting a Final Hearing as soon as practicable to consider approval of the Motion on a final basis and entry of a Final Order; and (iv) granting the Debtors such other and further relief as this Court may deem just and proper.

Respectfully submitted on the 25th day of July, 2020.

                              **OKIN ADAMS LLP**

                              By:     /s/ *Matthew S. Okin*
                              Matthew S. Okin
                              Texas Bar No. 00784695
                              Email: mokin@okinadams.com
                              Ryan A. O'Connor
                              Texas Bar No. 24098190
                              Email: roconnor@okinadams.com
                              1113 Vine St., Suite 240
                              Houston, Texas 77002
                              Tel: 713.228.4100
                              Fax: 888.865.2118

                              **PROPOSED ATTORNEYS FOR THE DEBTORS**

## CERTIFICATE OF ACCURACY PURSUANT TO B.L.R. 9013-1(i)

       In accordance with Bankruptcy Local Rule 9013-1(i), I hereby certify to the accuracy of the matters set forth in the foregoing Motion.

                              By:     /s/ *Matthew S. Okin*
                                Matthew S. Okin